CUTRER, Judge.
This appeal emanates from Grover T. Hollingshead’s suit seeking damages he incurred in an automobile collision on June 5, 1980. Hollingshead named as defendants: Paul E. White, driver of the other involved automobile, and Travelers Insurance Company (Travelers), Hollingshead’s uninsured motorist carrier. White filed a third party action against Mid-American Indemnity Company (Mid-American) seeking compensation for his own collision loss, indemnification for liability coverage and for attorney’s fees for defense of Hollingshead’s suit. Additionally, Travelers filed a third party action against Mid-American as a subrogee of the sums paid for Hollings-head’s property loss. Travelers also sued for Hollingshead’s deductible. Mid-American denied liability to any of the parties on the ground that its liability and collision coverage, previously issued to White, had been cancelled before the accident in question.
The trial court held that Mid-American’s policy had not been cancelled and rendered judgment against Mid-American on all claims. Mid-American appeals.
. The issue on this appeal is whether White’s insurance policy with Mid-American had been effectively cancelled prior to the accident.
FACTS
Dependable Insurance Agency, Inc. (Dependable) acted as a broker in obtaining the insurance coverage for White. Dependable submitted an application to Mid-American which was accepted. The annual premium to be paid by the insured was $679.76. White was unable to pay the premium in its entirety. At Dependable’s suggestion, White borrowed the premium money from the Bank of Southwest Louisiana. White executed an installment note payable at the rate of $84.79 with the first installment note to become due on November 19, 1979. Dependable, through its owner, endorsed the note. The Bank then transferred the principal sum of $679.76 to Dependable’s checking account and Dependable paid to Mid-American the full annual premium owed by White.
*1077 The policy was issued by Mid-American providing liability and collision coverage for the period of September 25, 1979, to September 25, 1980. The accident occurred on or about June 5, 1980.
The policy was sent to Dependable by Mid-American. It was then delivered to White. Dependable called the Bank and gave them the policy number. The number of the policy was entered upon the note indicating that the Bank intended that the policy was to be a pledge to secure the note. No delivery of the policy was made to the Bank. We will discuss the effect of the non-delivery later in this opinion.
During the early months of 1980, White failed to meet at least two installments. The Bank sent notices of such failure to White and to Dependable. Upon receipt of its notices Dependable sent letters to White requesting that White pay his installments. When White had not made any payments by the middle of March, the Bank began withdrawing money from Dependable’s account and applying them as the payment of White’s delinquent installments.
White had still not paid his overdue installments by the end of March. At this time Dependable requested Mid-American to cancel White’s policy for nonpayment of premiums. On March 31, 1980, Mid-American mailed a notice of cancellation to White and to the mortgage holder of the insured car, Calcasieu Southern Federal Credit Union (Calcasieu Southern). The cancellation was to take effect April 12, 1980.
White maintained that he never received his notice. Calcasieu Southern’s records contained a copy of this notice of cancellation in White’s file, but none of its employees could remember when Calcasieu Southern received the notice.
Dependable received a check from Mid-American for $278.80, the amount of White’s unearned premium. Dependable retained this check in satisfaction of the money withdrawn from its account by the Bank to meet White’s installments.
White paid an installment in early June 1980. A few days later the Hollingshead and White automobile accident occurred. When White contacted Dependable regarding his claim on the accident, White was informed that his policy had been cancelled. Mid-American denied any liability to White and refused to defend the suit against White. The suit for damages was filed and judgment rendered against Mid-American. In his oral reasons for judgment the trial judge stated that “[t]he attempted cancellation of the policy of insurance by Mid-American Indemnity Company was not legally effective...”
As we approach the issues in this case, we must be mindful of the fact that this is not a case where an insured defaults on a premium payment agreement made with the insurer. In case of a default by the insured in such an agreement with the insurer, the nonpayment of premium would give the insurer the right to cancel the insured’s policy.
In the case at hand, the insurer, Mid-American, was paid the full annual premium for White’s insurance out of the proceeds of a bank installment note executed by White and endorsed by the broker, Dependable. Upon default of payment to the Bank, Dependable had to pay the Bank the balance due on the note. Dependable, in seeking to recover the money it paid the Bank, caused Mid-American to issue a notice of cancellation to White and pay to Dependable the unearned premium previously paid to Mid-American.
The question then arises as to whether Dependable, a third party, had the authority to request cancellation of the policy for the failure of White to timely pay his installments at the Bank.
It is undisputed that Dependable was acting only as a broker in this transaction. “The broker ... is he who is empowered to negotiate between two parties and who, for that reason is the mandatory for both.” LSA-C.C. art. 3016. Once the insurance contract was secured by Dependable for White, Dependable’s responsibilities in the transaction ceased. I.C. Realty, Inc. v. Clifton Conduit Company, etc., 291 So.2d 422 (La.App. 4th Cir.1974). Under these princi- *1078 pies, if Dependable had any authority to cancel, it did not arise from its broker relationship with White or Mid-American. We then look to see if Dependable’s authority to cancel could have arisen otherwise.
The procedure for the cancellation of an automobile policy for the nonpayment of a premium is set forth in LSA-R.S. 22:636.1, which provides, in pertinent part, as follows:

“A. As used in this chapter:

(1) ‘Policy’ means an automobile liability, automobile physical damage or automobile collision policy, or any combination thereof, delivered or issued for delivery in this state, insuring a single individual or husband and wife resident of the same household, as named insured, and under which the insured vehicles therein designated are of the following types only:

jj< * * * * *

(6) ‘Nonpayment of premium’ means failure of the named insured to discharge when due any of his obligations in connection with the payment of premiums on a policy, or any installments of such premium, whether the premium is payable directly to the insurer or its agent or indirectly under anv premium finance plan or extension of credit.

“B. A notice of cancellation of a policy shall be effective only if it is based on one or more of the following reasons:

(1) Nonpayment of premium; ...” (Emphasis added.)
Paragraph D provides the method to be used in effectuating the cancellation of the automobile policy.
The jurisprudence, interpreting the above statute, holds that when a premium finance plan is entered into by the insured and a financing agency, and the insured defaults upon the payments thereof, the financing agency or its assignee has the authority to cancel the policy for the nonpayment of premium, when the financing agreement contains a provision wherein the insured assigns the right of cancellation to the financing agency in the event of the default of payments.
In the case of Armstead v. Aetna Casualty & Surety Co., 322 So.2d 299 (La.App. 1st Cir.1975), writ den., 323 So.2d 476 (La.1975), Armstead obtained a one year liability policy on his automobile from Travis-Bergeron Insurance Agency, Inc. The agency obtained the policy from Aetna Casualty & Surety Company. The annual premium was $236.00. Armstead paid $137.40 down and financed the balance through the Louisiana National Bank of Baton Rouge, Louisiana.
Armstead entered into a Premium Finance Agreement with the Bank which provided for installment payments of $17.62 each month. The Premium Finance Agreement also provided as follows:
“ ‘Aarent and insured further authorized the Louisiana National Bank of Baton Rouere to cancel any and/or all of said policies at any time that the insured is delinquent in meeting- his payments hereunder by more than five (5) days and authorize any insurer on receipt of any notice of cancellation of said policies to remit to Louisiana National Bank of Baton Rouge out of any and all return premiums from said insurance policies the balance of the insured’s then outstanding indebtedness hereunder to the Louisiana National Bank of Baton Rouge.’” (Emphasis added.)
Armstead became delinquent in his payments and the Bank called upon the Travis-Bergeron agency for payment of the delinquent installments, which it did. The note was then assigned to the Travis-Bergeron agency by the Bank. The agency mailed to Armstead a notice of cancellation. Twenty-seven days later Armstead’s wife and children were involved in an accident. He sued Aetna for injuries to the children. Aetna’s motion for summary judgment was sustained. The court held as follows:

“The issues before the court for decision are whether an insured mav assiem the rischt to cancel his insurance policy to a third party upon certain terms and conditions and whether the exercise of that right by a third party is violative of public policy or the law of this State. We 
*1079
find no Louisiana decision dealing with these questions. Further, the issue appears to be res nova.

“LSA-R.S. 22:687 provides in part as-follows:

‘A. Cancellation by the insured of any policy which by its terms is cancellable at the insured’s option or of any binder based on such policy may be effected by written notice thereof to the insurer and surrender of the policy or binder for cancellation prior to or on the effective date of such cancellation. In event the policy or binder has been lost or destroyed and cannot be so surrendered, the insurer may in lieu of such surrender accept and in good faith rely upon the insured’s written statement setting forth the facts of such loss of destruction.

‘B. Following such cancellation the insurer shall pay to the insured or to the person entitled thereto as shown by the insurer’s records, any unearned portion of any premium paid on the policy as computed on the customary short rate or as otherwise specified in the policy. If no premium has been paid on the policy, the insured shall be liable to the insurer for premium for the period during which the policy was in force. * * * t
“Clearly, this statute contemplates the cancellation by an insured of his own policy prior to expiration of its term. Whether the insurer is paid in full is immaterial. We conclude that this risrht mav be assigned by the insured to a third party and we perceive of no reason why such an assignment would be against public policy. See: Saskatchewan Gov’t Ins. Office v. Padgett, 245 F.2d 48 (5th Cir.1957). See also 115 A.L.R. 1212, 1213, and authorities cited therein.
“In the instant case the insured contractually authorized cancellation by Louisiana National Bank of this policy in the event of non-payment of the premium and, upon being paid by the agency after demand, the bank assigned that right of cancellation to the agent, who was legally and conventionally subrogated thereto, (cf., Nagem Electric Co. v. Aetna Ins. Co., 195 So. 76, (La.App. 1st Cir.1940)). The insured was properly notified of the impending cancellation and candidly testified on deposition that, at that time, he had no money with which to pay the last installment. He thereafter cashed the unearned premium check.” (Emphasis added.)
After citing LSA-R.S. 22:636.1, Subpara-graph A(6), the court held as follows:
“Thus, policy cancellations for nonpayment of premium ‘under any premium finance plan or extension of credit’ are sanctioned by the laws of this state and are obviously not contrary to public policy. The policy purchased by Armstead was properly cancelled because of the insured’s failure to pay the premium according to the terms of the agreement. Therefore, there being no genuine issue of material fact to be resolved and the defendant being entitled to judgment as a matter of law, the motion for summary judgment was properly granted. LSA-C. C.P. Article 966.” (Emphasis added.)
The case of Armstead was followed by the recent case of Barnes v. United States Auto Assn, 416 So.2d 611 (La.App. 5th Cir. 1982), which case contained facts strikingly similar to Armstead.[1]
In the case at hand there is no evidence that White assigned to the Bank or Dependable the right to cancel his policy. Mid- *1080 American contends that Dependable acquired this right from the Bank when Dependable’s money was used to satisfy White’s delinquent note. This argument is without merit.
The note executed by White and endorsed by Dependable is a form installment note containing a pledge provision. The note contains no assignment by White of the right to cancel as was the case in Armstead, supra, and Barnes, supra. There being no assignment in the note by White, we focus on whether the alleged pledge of the policy to the Bank to secure the note would have the effect of authorizing cancellation for default in payment. Upon examination of the circumstances, we do not need to pass upon this issue because it is undisputed that the policy was never delivered to the Bank in compliance with the law of pledge. The policy was sent to White where it remained until the time of trial.
LSA-C.C. art. 3158 discusses the formalities, contents and requirements for pledge of written obligation. In pertinent part, LSA-C.C. art. 3158 states:

“[A]ll pledges may be made by private writing of any kind if only the intention to pledge be shown in writing, but all pledges, except of a life insurance policy in favor of the insurer, must be accompanied by actual delivery

White’s policy number appears on his promissory note within the security provision. Mrs. Melder (with Dependable) explained that, upon the arrival of White’s policy from Mid-American, she furnished the Bank with White’s policy number and forwarded the original policy to White. Obviously, the policy number was inserted in White’s promissory note at the Bank.
In summary, Dependable did not have authority to cancel White’s insurance, therefore, Mid-American, having been fully paid for White’s premium, wrongfully issued the notice of cancellation. The trial court was correct in finding Mid-American’s cancellation of White’s insurance was not legally effective. The trial court judgment shall be affirmed.
We do not need to make a determination of whether White was properly notified of the cancellation by Mid-American.
For these reasons, the judgment of the trial court is affirmed. Mid-American Indemnity Company, defendant-appellant, shall pay the costs of this appeal.
AFFIRMED.

. By Act 694 of 1980, the Legislature amended several sections of the Consumer Credit Law. The Legislature added a new section regulating insurance premium finance companies. In doing so, the Legislature continued the effect of Armstead and Barnes by inserting LSA-R.S. 9:3550 G(l), which provides as follows:
“G. Insurance contracts may be cancelled upon default as follows:
(1) When a premium finance agreement contains a power of attorney enabling the insurance premium finance company to cancel any insurance contract or contracts listed in the agreement, the insurance contract or contracts shall not be cancelled by the insurance premium finance company unless such cancellation is effectuated in accordance with this Subsection.”